**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CYTEC INDUSTRIES INC.,

                                   Plaintiff,

        v.

ALLNEX (LUXEMBOURG) & CY S.C.A.,

                                   Defendant.

Civil Action No. 14 Civ. 1561 (PKC)

**COMPLAINT**

        Plaintiff Cytec Industries Inc. ("Cytec"), by and through its undersigned counsel, alleges upon knowledge as to itself and its own acts, and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

1.      This dispute arises out of an October 8, 2012 Stock and Asset Purchase Agreement (the "Agreement") between Cytec, AI Chem & Cy S.C.A. ("AI Chem"), and WP Invest GmbH ("GmbH").  The Agreement is attached hereto as Exhibit A.

2.      AI Chem changed its name and is now known as Allnex (Luxembourg) & Cy S.C.A. ("Allnex").  Allnex is organized under the laws of Luxembourg and based in Luxembourg with operations in Belgium.

3.      Under the Agreement, Allnex agreed to pay a base purchase price of approximately $1.04 billion (and GmbH agreed to pay $2,080) in exchange for Cytec's coating resins business, consisting of assets in the United States and the shares of Cytec's international subsidiaries engaged in that business (the "Transferred Subsidiaries," together, with the domestic assets, the "Business").  The Business supplies resins, additives, and specialty materials used for architectural, industrial, protective, and automotive applications.

4.     The Agreement contains a series of representations and warranties by both the buyer and the seller, as well as twenty-six covenants, concerning, among other things, the conduct of the Business between the signing of the Agreement and Closing.[1]

5.     The Agreement also contains a set of indemnification provisions.  Pursuant to those provisions, the rights and remedies thereunder are "exclusive and in lieu of any and all other rights and remedies" with respect to any claim for "any breach of any representation or warranty or any failure to perform any covenant or agreement set forth in this Agreement."  Any indemnification claim for breach of a representation or warranty is subject to a $13 million Deductible and a $104 million Cap, as discussed *infra* ¶ 27.

6.     The Agreement further provides that the parties must bring "any action or proceeding in respect of any claim arising out of or related to [the] Agreement or the transactions contained in or contemplated by [the] Agreement . . . exclusively in the United States District Court for the Southern District of New York or any New York State court sitting in the Borough of Manhattan in New York City."

7.     Separately, the Agreement provides that, after closing, the Agreement's Base Purchase Price—which was based, in part, on an estimate of $208 million in working capital at the Business—could be adjusted (upward or downward), within limits, through a series of steps.  At closing, Allnex would pay an amount based on Cytec's good faith estimate of the Business's net working capital (up to a cap of $240 million) less indebtedness plus necessary operating cash (up to a cap of $20 million).  After closing, Allnex had the opportunity to deliver a statement setting forth its alternative calculations to adjust the

---

[1]     Undefined capitalized terms used herein have the same meaning as in the Agreement.

closing price based on its own calculations of the figures for net working capital, indebtedness, and necessary operating cash. Cytec had the opportunity to object to Allnex's calculations; Allnex then had a final opportunity to respond to Cytec's objection. The parties, thereafter, could resolve the differences between these calculations, and, failing an agreement, submit any unresolved items to an accounting firm (the "CPA Firm") to determine which calculations require adjustment.

8.    In the context of this reconciliation process, Allnex has asserted three impermissible downward adjustments to the purchase price that are primarily at issue in this action:  (i) a $33.7 million adjustment to net working capital predicated on third-party payments that Allnex contends were not "consistent with [Cytec's] historical ordinary course management of items of working capital" (the "Vendor Claim"); (ii) an $11.8 million adjustment to net working capital based on Citibank Europe plc's ("Citibank") termination of an allegedly undisclosed financing agreement whereby, in previous years, Citibank would purchase accounts receivable of DuPont Chemical ("DuPont") from Cytec (the "Citibank Claim"); and (iii) a $3.7 million adjustment predicated on Allnex's contention that this amount of cash—though indisputably in the hands of one of the Transferred Subsidiaries in China now belonging to Allnex—did not meet the definition of "Necessary Operating Cash" under the Agreement (the "Chinese Cash Claim," collectively, with the Citibank Claim and the Vendor Claim, the "Disputed Claims").[2]

---

[2]    In addition, there is an additional downward adjustment that Allnex has asserted that is at issue. That claim, relating to the sale of bank drafts by a Shanghai subsidiary, would only need to be resolved by this Court if the Court were to deny Cytec's requested relief for any of the Disputed Claims.  The Disputed Claims, if resolved in Cytec's favor, would raise the Business's net working capital to the $240 million cap.  Therefore, the
*(continued)*

- 3 -

9.     Each of these claims by Allnex is premised not on any issue that is subject to the

jurisdiction of the CPA Firm, but on Allnex's claim that Cytec failed to comply with a

covenant or representation and warranty or on a legal dispute over the contours of the

Agreement.  These claims are within the exclusive jurisdiction of this Court, and would

be subject to the Deductible and Cap.  In particular, the Disputed Claims rest on (i) an

allegation that Cytec breached its covenant to continue operating the Business consistent

with historical practices (with respect to the Vendor Claim); (ii) an allegation that Cytec

breached its representation and warranty that it disclosed all contracts worth more than $1

million (with respect to the Citibank Claim); and (iii) an attempt to take improper

advantage of the clerical omission of a schedule from the final executed Agreement (with

respect to the Chinese Cash Claim).

10.     Allnex has taken the position that the Disputed Claims should be resolved by the CPA

Firm (and that the parties must proceed to "mutually agree" as to which independent firm

to use, as is required under the Agreement).

11.     Accordingly, by this action, Cytec seeks a declaratory judgment that the purchase price

adjustment provisions do not apply to the Disputed Claims, because they are beyond the

jurisdiction of the CPA Firm and are instead subject to this Court's jurisdiction under the

indemnification provisions.

12.     Cytec also seeks a declaratory judgment that Allnex's interpretation of the Agreement

that forms the basis of its position is incorrect:  under the Agreement, (i) Cytec was not

prohibited from making the early payments at issue (with respect to the Vendor Claim);

_____

reversal of any additional downward adjustments by Allnex that would affect the
calculation of the Business's net working capital would be moot.  *See infra* ¶¶ 77-79.

(ii) Citibank's decision to terminate the DuPont account receivable purchase arrangement is not a basis for Allnex to reduce the purchase price (with respect to the Citibank Claim); and (iii) Allnex's interpretation of the term Necessary Operating Cash to exclude assets held in China that were addressed in the missing schedule is likewise not a basis to reduce the purchase price (with respect to the Chinese Cash Claim).

13.     Finally, Cytec seeks a money judgment in the amount of $36,676,279 million based on the foregoing declaratory judgments, representing the amount Allnex owes Cytec once the Disputed Claims are resolved in Cytec's favor, as well as damages arising out of Allnex's breaches of the implied covenant of good faith and fair dealing.

## PARTIES

14.     Cytec is a Delaware Corporation with its principal place of business located in New Jersey.

15.     Allnex is owned by one or more investment funds managed by Advent International Corporation, a global private equity firm based in Boston, Massachusetts.  Allnex is organized under the laws of Luxembourg and based in Luxembourg with operations in Belgium.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a).  The citizenship of Cytec is diverse from that of Allnex, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

17.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this district.  Moreover, Section 8.8(b) of the Agreement provides that the parties "agree[] that [they] shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the

transactions contained in or contemplated by this Agreement . . . exclusively in the United States District Court for the Southern District of New York or any New York State court sitting in the Borough of Manhattan in New York City . . . [and] irrevocably submit[] to the exclusive jurisdiction of" these chosen courts.

18.    Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201 because an actual controversy exists regarding the Disputed Claims and the proper contractual mechanism for Cytec to seek recovery.

## BACKGROUND

19.    The Agreement, executed on October 8, 2012, provides for the sale of the Business for the base amount of $1.04 billion (subject to adjustment, as described more fully below).

20.    Though the Agreement was silent on the exact date that the closing would take place, the parties aimed to close the transaction by late March 2013.  Closing, however, was contingent on the parties' obtaining approval from the applicable antitrust authorities in China.  On March 29, 2013, when it became clear to the parties that the transaction would not close by March 31, the parties executed a side letter agreement.  In the side letter, the parties agreed that if the closing occurred after March 31 but before April 5, 2013, then "all provisions set forth in the [Agreement] that address purchase price mechanics . . . shall be calculated as if the Closing occurred" on March 31, 2013.

21.    The transaction closed on April 3, 2013.

### A.    The Agreement's Covenants and Representations and Warranties

22.    The majority of the provisions of the Agreement consist of representations and warranties by the buyer or seller; covenants between the parties; and the provisions governing any breaches thereof.

23.  Article IV of the Agreement contains twenty-six covenants.  Section 4.3 of the
Agreement, entitled "Seller's Conduct of Business," provides that, between the date of
the Agreement and closing, Cytec would "conduct . . . the Business in the ordinary
course," but, as an exception to that general requirement, could "take, or cause its
Affiliates to take, any action which is consistent with management of working capital to
the extent reasonably necessary to achieve a level of Final Closing Net Working Capital
Value that is less than or equal to $240 million, provided that such management of
working capital shall not be materially detrimental to the operations of the Business and
shall be consistent with historical ordinary course management of items of working
capital (without regard solely to management of amounts of such items)."

24.  Section 4.3 is subject to certain qualifications in Schedule 4.3.  Item 6 of Schedule 4.3
specifically lists as an Exception to Conduct in Ordinary Course, and therefore permitted,
"any action by [Cytec] taken in order to reduce operating cash of the Business below
$10,000,000."

25.  The parties also agreed to (i) cap the amount of working capital and cash in the Business
for which Allnex would compensate Cytec, and (ii) provide a mechanism for reducing the
Business's working capital and cash because Allnex financed the deal and did not want to
have to pay to finance excessive amounts of cash.

26.  Further, Article VI of the Agreement contains a series of provisions relating to
indemnification for, among other things, breaches of representations, warranties, and
covenants.

27.  Section 6.2 provides for indemnification by Cytec for any "Losses[] imposed on,
sustained, incurred or suffered by . . . [Allnex] to the extent directly or indirectly relating

to or arising out of:  (i) [a]ny actual or alleged breach of any representation or warranty made by [Cytec] contained in this Agreement or . . . (ii) any breach of any covenant or agreement of [Cytec] contained in this Agreement."  For breaches of warranties or representations, Cytec is only liable for "Losses [that] exceed an aggregate amount equal to $13,000,000 (the 'Deductible'), . . . up to an aggregate amount of Losses . . . equal to $104,000,000 (the 'Cap')."

28.   Under Section 6.8, indemnification is the "exclusive" remedy for "any breach of any representation or warranty or . . . any covenant" and is "in lieu of any and all other rights remedies that [Allnex] and [Cytec] may have after the Closing."

29.   Section 8.8, entitled "Governing Law; Submission to Jurisdiction; Selection of Forum; Waiver of Trial by Jury," provides that "[e]ach party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement . . . exclusively in the United States District Court for the Southern District or any New York State court sitting in the Borough of Manhattan in New York City"; that the parties "irrevocably" submit to the "exclusive jurisdiction" of these courts; and that the parties waive any objections to venue or inconvenient forum.

**B.    The Agreement's Provisions Regarding Post-Closing Adjustments**

30.   Sections 1.5 and 1.6 of the Agreement, entitled "Purchase Price" and "Determination of Final Closing Net Working Capital Value," respectively, set forth the mechanics for calculating and then adjusting the $1.04 billion Base Purchase Price.  The Base Purchase Price was to be adjusted downward or upward to the extent that three variable components were, at Closing, greater or less than estimated amounts that were initially used in setting the price.  These three elements are net working capital; Necessary Operating Cash; and aggregate indebtedness.

31.   <u>Net Working Capital.</u>  Under Sections 1.5(c) and (d), the Base Purchase Price is to be adjusted by the extent to which the Final Closing Net Working Capital Value is greater or less than the Base Net Working Capital Value of $208 million.  Annex I of the Agreement defines "Final Closing Net Working Capital Value" as Current Assets minus Current Liabilities, determined as of the closing date, but the term "Current Assets" excludes, among other things, Cash.  Section 1.5(b) provides that the Final Closing Net Working Capital Value cannot exceed $240 million.  The components of net working capital are set forth in Schedule A-3, which is described in the definition of Closing Date Net Working Capital Statement as providing an "illustrative example" of a net working capital statement based on "hypothetical" numbers.

32.   <u>Necessary Operating Cash.</u>  Under Section 1.5(d), the Base Purchase Price is also to be adjusted by the extent to which Net Operating Cash at Closing is different from a base amount.  As with the Final Closing Net Working Capital Value, the final Net Operating Cash amount is capped, in this case at $20 million.  Thus, Annex I of the Agreement defines "Net Operating Cash" with respect to a Transferred Subsidiary as "Cash that is capable of being freely transferred among the Transferred Subsidiaries in an amount up to the dollar amount set forth next to such Transferred Subsidiary's name as set forth on Schedule 4.21 and in the aggregate not in excess of $20 million."  Although Schedule 4.21 was part of the parties' discussions, it was unintentionally omitted from the executed version of the Agreement.  *See infra* ¶¶ 71-73.  The final, agreed-upon draft of Schedule 4.21 provides that "Up to $10,000,000 in China (or equivalent in other currency) and up to an aggregate of an additional $10,000,000 (or equivalent in other currency) in all other locations."

33.   Indebtedness. Section 1.5(b) provides that the aggregate indebtedness of the Business at closing that were not liabilities retained by Cytec would also be subtracted from the Base Purchase Price. This calculation is not disputed between the parties.

34.   Post-Closing Purchase Price Adjustment Procedure. Sections 1.5 and 1.6 set forth a six-step procedure for making these adjustments to the Base Purchase Price. First, Section 1.5(b) provides that five Business Days prior to Closing, Cytec was to provide a certificate setting forth its good faith estimate of the value, as of the closing date, of the Business's (i) net working capital (ii) Necessary Operating Cash, and (iii) aggregate indebtedness. These estimates form the basis of the amount actually paid at Closing, which turned out to be $1.019 billion.

35.   Second, Section 1.6(a) provides that, within 90 days of closing, Allnex must prepare a "Closing Date Net Working Capital Statement," and its own calculation of "the aggregate amount of Necessary Operating Cash of all of the Transferred Subsidiaries as of the Closing Date." The section further provides that the Closing Date Net Working Capital Statement and calculation of Necessary Operating Cash "shall be prepared in accordance with U.S. GAAP applying the same principles, practices, methodologies and policies used in the preparation of the Audited Financial Statements," elsewhere (Section 2.7) defined as the audited balance sheets, statements of operations, cash flows, and investments for previous fiscal years.

36.   Third, under Section 1.6(b), Cytec was given 60 days to review the Closing Date Net Working Capital Statement and calculation of Necessary Operating Cash, and determine whether they have been "prepared on the basis set forth in Section 1.6(a)," and, if not, to lodge an objection (the "Objection").

37.    Fourth, Allnex was thereafter afforded 30 days to review the Objection, and to respond.

38.    Fifth, under Section 1.6(c) (the "Referral Clause"), the parties were required to use

"reasonable best efforts to resolve any disagreements with respect to the proposed

adjustments set forth in the Seller's Objection."

39.    Sixth, if they were unable to do so, the parties were to refer the Unresolved Items to an

accounting firm for resolution.  The Referral Clause states:

> If [Allnex] and [Cytec] are unable to resolve . . . disagreements
> [with respect to the proposed adjustments set forth in Cytec's
> Objection] within thirty (30) days following the completion of
> [Allnex's] review of [Cytec's] Objection, they shall refer any
> remaining disagreements (the "Unresolved Items") to the CPA
> Firm that, acting as experts and not as arbitrators, shall determine,
> on the basis set forth in and in accordance with Section 1.6(a), and
> only with respect to the Unresolved Items, whether and to what
> extent, if any, the Closing Date Net Working Capital Statement
> and the Final Closing Net Working Capital Value and/or Buyer's
> calculations of the Actual Cash Amount and/or the Actual
> Indebtedness Amount require or requires adjustment.

40.    This provision does not incorporate any arbitration rules or other provisions, and does not

provide the CPA Firm with power to decide whether a dispute is properly within its

jurisdiction.  The instant action is a separate dispute that is subject to the general dispute

resolution provision in Section 8.8(b) (and thus subject to resolution by this Court).

### C.    The Disputed Claims

41.    On March 20, 2013, pursuant to Section 1.5(b), Cytec delivered its Purchase Price

Certificate setting forth Cytec's estimates for Closing Net Working Capital, Closing Cash

Amount, and Estimated Indebtedness.  The Purchase Price Certificate estimated net

working capital to be $198.8 million (which both parties subsequently agreed should be

adjusted upwards, though the parties disagreed as to the amount of the upward

adjustment) and Cash to be $12 million (which both parties subsequently agreed should be adjusted downwards, but not how much).

42. On July 2, 2013, pursuant to Section 1.6(a), Allnex delivered its Closing Date Net Working Capital Statement to Cytec, attached hereto as Exhibit B.  This statement stated Allnex's calculation of Final Closing Net Working Capital Value to be $204.3 million; Actual Cash to be $3.8 million; and Actual Indebtedness to be $3.9 million.

43. On August 30, 2013, pursuant to Section 1.6(b), Cytec objected to Allnex's calculations and delivered its own Final Closing Date Net Working Capital Statement, attached hereto as Exhibit C.  This stated Cytec's calculation of Final Closing Net Working Capital Value to be in excess of $240 million;[3] Actual Cash to be $13.8 million (which Cytec subsequently adjusted to $7.5 million); and Actual Indebtedness to be $3.9 million. These figures mean that Allnex underpaid Cytec by $36,676,279.

44. On September 27, 2013, Allnex responded to Cytec's objection by providing another Final Closing Date Net Working Capital Statement, attached hereto as Exhibit D.  This statement set forth Allnex's newest calculations, which were that Final Closing Net Working Capital Value was $208.9 million; Actual Cash was $3.8 million; and Actual Indebtedness was $3.9 million.  These figures would mean that Allnex underpaid Cytec by $1,896,438.  Allnex has not yet paid even this amount.

45. The parties' differing calculations derive principally from the three Disputed Claims:  the Vendor Claim, the Citibank Claim, and the Chinese Cash Claim.[4]  By excluding the

---

[3]     Under Cytec's calculations, net working capital of the Business would be $261.3 million, capped at $240 million pursuant to Section 1.5(d) of the Agreement.

[4]     As indicated in Exhibit C (at 2 n.2 & Ex. 2), there are other disputes between the parties relating to whether Allnex's Closing Date Net Working Capital Statement was prepared
*(continued)*

Disputed Claims from its calculation of Final Closing Net Working Capital Value and

Actual Cash, Allnex seeks to shortchange Cytec by $36,676,279 million.

### 1.    The Vendor Claim

46.    In March 2013, prior to the closing, Allnex claims that Cytec paid $33.7 million[5] in

accounts payable prior to March 31 that were due after the March 31 effective closing

date.

47.    These early payments were intended to reduce, and had the effect of reducing, the

operating cash of the Business below the cash threshold set forth in Section 1.5 of the

Agreement, and below the $10 million cap set forth in Schedule 4.3.  These early

payments also increased net working capital because they decreased trade payables,

which are liabilities.

48.    Allnex's Section 1.6(a) Closing Date Net Working Capital Statement, delivered on July

2, 2013, however, artificially increased the amount of accounts payable recorded in

Cytec's financial records as though those accounts had not been paid.  The sole

justification Allnex supplied for the artificial adjustment was that Cytec "fail[ed] to settle

accounts payable in the ordinary course of business consistent with [its] past practices,"

---

in accordance with the standards set forth in Section 1.6(a) — that is, "in accordance with
U.S. GAAP applying the same principles, practices, methodologies and policies used in
the preparation of the Audited Financial Statements" and concerning foreign currency
amounts as set forth in Schedule 1.6(a).  These disputes would be for the CPA Firm to
resolve, if that were necessary.  However, in Cytec's view, these items would not serve to
increase the Final Net Closing Working Capital Value, which is already at the capped
amount of $240 million, so there is no need to invoke the CPA Firm procedures.  If,
however, the Court should deny some or all of the relief requested herein, such that the
Final Net Closing Working Capital Value was reduced below $240 million, the parties
would need to proceed to address these other unresolved items before the CPA Firm.

[5]    Allnex calculated the $33.7 million figure after closing, and Cytec has not independently
verified its accuracy, but assumes, for the purposes of this Complaint, that it is correct.

and that Cytec's statement failed to conform to "the illustrative working capital items" in Schedule A-3.

49.    Remarkably, while reducing the calculation of net working capital on the ground that the funds used by Cytec to pay vendors should have remained in cash, Allnex has *not* correspondingly increased the Actual Cash Amount—which is the logical corollary of the position it is taking with respect to the Vendor Claim.

50.    Allnex's position is wrong for three reasons:

51.    *First*, Allnex is wrong as a matter of law. As noted *supra* ¶ 24, Schedule 4.3 permits Cytec to take any action to "reduce operating cash of the Business below $10,000,000 in the aggregate, exclusive of any cash in China." Because Cytec's early payments were designed to (and had the effect of) reducing cash below the $10 million cap, they were expressly permitted under the Agreement. Allnex's contention that the early payments are barred by Section 4.3's limitation on Cytec's ability to manage working capital— prohibiting actions that are "materially detrimental to the operations of the Business and shall be consistent with historical ordinary course management"—applies only when Cytec is acting to decrease working capital to reach the $240 million cap. As discussed, the early payments decreased cash, but *increased* net working capital.

52.    *Second*, Allnex is wrong as a factual matter because Cytec's early payments were consistent with its historic practices. Cytec pays, and historically has paid, vendors prior to the final date on which invoices are due, particularly towards the end of a quarter and before holidays, to avoid delays. For example, in December 2012, Cytec, in the operation of the Business, made $5 million in early payments. Here, the closing was originally planned to occur in late March 2013, which is both the end of a quarter and

coincided with the Easter weekend. Thus, the payments were consistent with historical practice.

53. The payments were also independently justified by the operational needs of the Business. In preparation for a March 2013 closing, Cytec began efforts to transition certain parts of the Business to a new computer system, which resulted in Cytec completely shutting down the payment and accounting systems for the Business for several days. Cytec was concerned that if the operating system was not successfully implemented, it would not be able to pay invoices on time. Thus, in order to continue its historical practice of not paying invoices late, Cytec paid certain invoices due after March 31 early, before the system change-over.

54. *Third*, Allnex's argument that Cytec's statement failed to conform to Schedule A-3 is also wrong as a matter of law. Cytec's statement was fully consistent with Schedule A-3. Schedule A-3 calls for certain enumerated adjustments to reported current assets and liabilities, and there is no adjustment to eliminate reported early payments of accounts payable as sought by Allnex.

55. The parties' dispute over the Vendor Claim is outside the jurisdiction of the CPA Firm. Section 1.6(c) is a narrow dispute resolution procedure, which only refers issues particularly in the competence of accountants to a CPA firm. The CPA Firm, "acting as experts and not as arbitrators," is called upon to resolve "on the basis set forth in and in accordance with Section 1.6(a)," whether the parties' calculations of, as relevant here, cash and Final Closing Net Working Capital Value "require adjustment."

56. Allnex's position is that the payment of the accounts receivable in advance of their due dates was not in accordance with ordinary business practices or with "historical ordinary

- 15 -

course management of items of working capital." That is a question of contractual

interpretation, specifically, what Cytec is permitted to do under the Section 4.3 covenant

and the corresponding exceptions thereto. It is thus a dispute about whether a covenant

was breached and is subject to the exclusive jurisdiction of this Court under Sections 6.8

and 8.8 of the Agreement.

### 2.   The Citibank Claim

57.   Prior to the Agreement, Cytec entered into a series of "Account Receivable Purchase

Agreements" ("ARPAs") with Citibank, whereby Citibank agreed to purchase for cash in

advance of the due date certain accounts receivable regularly owed to Cytec from

DuPont's performance coatings business. As a result of these agreements, DuPont

received an additional forty-five days to pay the money that it owed to Cytec, and Cytec

received the money owed earlier than the date it would regularly have been due from

DuPont. Cytec accepted a discounted payment from Citibank in exchange for this

arrangement.

58.   In August 29, 2012, however, DuPont announced that it would sell the performance

coatings business to The Carlyle Group. Citing the sale, in January 2013, Citibank

terminated the practice of agreeing to ARPAs because it considered the subsidiary less

credit-worthy without DuPont's financial backing.

59.   In its July 2, 2013 Closing Date Net Working Capital Statement, Allnex excluded $11.77

million in DuPont accounts receivable from its calculation of net working capital.

60.   The sole justification cited by Allnex for the $11.77 million downward adjustment is that,

"consistent with [Cytec's] due diligence report to [Allnex]," Citibank's decision to stop

purchasing the receivables "resulted in a permanent change to working capital that is not

accounted for in either the Base Net Working Capital Value or the illustrative working capital statement in Schedule A-3."

61.    Allnex's position is wrong as a matter of law.

62.    As with the Vendor Claim, Cytec's calculations are fully in accord with the Net Working Capital calculations in Schedule A-3, which do not provide for elimination of any reported accounts receivable on the ground that they were not purchased by Citibank. While the levels of accounts receivable as of the Closing were different from Schedule A-3, that Schedule was expressly stated to be merely an "illustrative example of the net working capital statement" that was based on "hypothetical" numbers.  Agreement Annex I-7.  Nothing required Cytec's Final Closing Net Working Capital Value to match Schedule A-3.

63.    To the extent that Allnex claims that Cytec failed to disclose the ARPAs during due diligence, Allnex is alleging that Cytec breached Section 2.17(a)(ii) of the Agreement, which provides that Schedule 2.17(a) to the Agreement contains a "complete and correct list, as of the date of this Agreement, of each of the Contracts . . . [that] involves aggregate consideration (whether in cash or in the value of goods and/or services) to be paid or received by [Cytec] . . . in excess of $1,000,000 per year."

64.    Even assuming that Cytec breached this provision of the Agreement, Allnex has suffered no loss from any such breach because Allnex will still receive payment from DuPont for the receivables.  The payments Cytec received from Citibank were payments discounted for the time-value of money.  Allnex can choose to either receive full payments from

DuPont on the payment due date or enter into similar arrangements with a different financial institution.[6]

65.     Moreover, a breach of representation or warranty claim is subject to the $13 million Deductible under Section 6.2(b) of the Agreement. Since Allnex's $11.77 million claim does not satisfy the Deductible, Cytec cannot be held liable under the Agreement. Allnex improperly attempts to characterize the Citibank Claim as an adjustment to net working capital to be decided by the CPA Firm, rather than a breach of a representation, in order to attempt to avoid this Deductible entirely.

66.     Like the Vendor Claim, *see supra* ¶¶ 46-56, the parties' dispute over the termination of the DuPont ARPAs practice is thus a dispute over whether Cytec breached a representation in the Agreement, and if Cytec failed to comply, whether Allnex suffered any losses as a result of any breach. This is a contractual dispute that falls outside the narrow referral process outlined in Section 1.6(c).

### 3.     The Chinese Cash Claim

67.     During the course of negotiations, the parties agreed that, in calculating the Purchase Price, Allnex would pay (i) up to $10 million for any Cash located in Chinese bank accounts; and (ii) up to $10 million for Cash held in other parts of the world. This agreement was ratified at a meeting held on or around October 3, 2012, and re-affirmed when the Agreement was signed.

---

[6]     If the Court rules in Cytec's favor on the Vendor Claim, then Allnex has suffered no loss from any alleged breach of Section 2.17(a)(ii) of the Agreement because Allnex received $261.3 million in net working capital while only paying for $240 million. *See supra* n.3. Reducing $261.3 million by Allnex's $11.77 million claim yields $249.5 million of net working capital, which is still more than the $240 million.

68. The parties' mutual understanding was reflected in the Agreement's definition of "Necessary Operating Cash," which is defined to mean: "Cash that is capable of being freely transferred among the Transferred Subsidiaries in an amount up to the dollar amount set forth next to such Transferred Subsidiary's name as set forth on Schedule 4.21 and in the aggregate not in excess of $20 million."

69. The parties exchanged drafts of Schedule 4.21 on or around October 6, 2012. In each of those drafts, Schedule 4.21 states: "Up to $10,000,000 in China (or equivalent in other currency) and up to an aggregate of an additional $10,000,000 (or equivalent in other currency) in all other locations."

70. The reason the parties reached an agreement to treat Chinese Cash differently from Cash situated in other locations was that the parties understood that it takes longer to obtain government approvals to transmit cash outside of China than in other locations. The parties stipulated that Cytec would receive credit for up to $10 million in Cash in China in order to avoid any dispute about whether the funds were "freely transferrable."

71. Through an inadvertent error, the executed version of the Agreement omitted Schedule 4.21.

72. Prior to the Agreement's signing, Allnex had never indicated—in writing or otherwise— that it would refuse to pay for up to $10 million in Chinese Cash.

73. At a meeting on or around July 15, 2013 (after the Closing), Allnex conceded that the parties had agreed, in October 2012, that Allnex would pay for up to $10 million in Chinese Cash, and that the failure to include Schedule 4.21 was an oversight.

74. Nevertheless, both of Allnex's Closing Date Net Working Capital Statements exclude $3.7 million in Chinese Cash from their calculation of Necessary Operating Cash.

75.   Allnex's position is wrong as a matter of law, insofar as it does not reflect the parties' agreement on this issue.

76.   The parties' dispute over whether the Chinese Cash fits the Agreement's definition of Necessary Operating Cash is a contractual one that falls outside the narrow referral process outlined in Section 1.6(c).

### 4.   Shanghai Bank Draft Claim

77.   As noted *supra* ¶ n.2, there is an additional disputed item that is within the jurisdiction of this Court and not the CPA Firm.  In March 2013, a Transferred Subsidiary, Cytec Surface Specialities (Shanghai) Co., Ltd., briefly stopped selling bank drafts received from its customers.  Allnex claims this amounted to a "change in historic accounting practices" that requires a downward adjustment to Net Working Capital of $193,230 "consistent with" Schedule A-3 (the "Shanghai Bank Draft Claim").

78.   Cytec, by contrast, maintains that this "does not represent a change in business practices as [Cytec] evaluates the decision to sell bank drafts based on the existing facts and circumstances," and thus Allnex's adjustment is improper.  Ex. C (at 5).

79.   Like the Vendor Claim, *see supra* ¶¶ 46-56, the parties' dispute over the Shanghai Bank Draft Claim turns on whether Cytec complied with the "ordinary course" covenant.  This is a contractual dispute that falls outside the narrow referral process outlined in Section 1.6(c).  This dispute, however, only requires resolution by the Court if relief is denied on any of the other claims so as to reduce the proper Final Closing Net Working Capital Value below the $240 million cap.

### COUNT ONE:  DECLARATORY JUDGMENT THAT THE UNRESOLVED ITEMS ARE NOT ARBITRABLE

80.   Cytec hereby repeats and realleges the allegations set forth in paragraphs 1-79 of this Complaint as if fully set forth herein.

81.   There is an actual controversy between Cytec and Allnex regarding the scope of the indemnification and submission to jurisdiction clauses, on the one hand, and the Referral Clause on the other hand, and the corresponding rights and duties of the parties.

82.   Cytec's position is that the Disputed Claims and the Shanghai Bank Draft Claim are allegations that Cytec breached the Agreement's covenant found in Section 4.3, the representation and warranty in Section 2.17(a)(ii), and related issues, all of which are matters of contractual interpretation that are outside the scope of matters to be referred to the CPA Firm to resolve.  Rather, a court has jurisdiction, and is better equipped, to decide whether the disputed adjustments are permitted under the language of the Agreement.  Allnex has taken the opposite view.

83.   These disputes are immediate and real because Allnex is seeking a reduction in the purchase price as described above and seeks to submit the dispute to the CPA Firm.

84.   Accordingly, pursuant to 28 U.S.C. § 2201, Cytec requests a declaration from this Court that the Disputed Claims and the Shanghai Bank Draft Claim are outside the scope of the Referral Clause, as set forth in the Prayer for Relief contained herein.

### COUNT TWO:  DECLARATORY JUDGMENT THAT CYTEC'S INTERPRETATION OF THE AGREEMENT IS CORRECT

85.   Cytec hereby repeats and realleges the allegations set forth in paragraphs 1-84 of this Complaint as if fully set forth herein.

86.   There is an actual controversy between Cytec and Allnex regarding Cytec's compliance with the covenant found in Section 4.3, Cytec's compliance with the representation and

warranty found in Section 2.17(a)(ii), and the meaning of Necessary Operating Cash under the Agreement.

87.  These disputes are immediate and real because Allnex is seeking a reduction in the purchase price as described above, which it has not yet paid in full.

88.  Accordingly, pursuant to 28 U.S.C. § 2201, Cytec requests a declaration from this Court that (i) the vendor payments described *supra* ¶¶ 46-56 were permitted under the Agreement; (ii) Citibank's decision to terminate the accounts receivable transactions described *supra* ¶¶ 57-66 is not a permissible ground for Allnex's claimed adjustment of the purchase price; and (iii) notwithstanding the parties' inadvertent omission of Schedule 4.21 from the executed version of the Agreement, Allnex must compensate Cytec for the $3.7 million in cash belonging to the Transferred Subsidiaries for which Allnex is wrongfully refusing to compensate Cytec.[7]

### COUNT THREE: MONEY JUDGMENT IN FAVOR OF CYTEC

89.  Cytec hereby repeats and realleges the allegations set forth in paragraphs 1-88 of this Complaint as if fully set forth herein.

90.  Based on the foregoing declaratory judgments, Cytec requests a money judgment against Allnex in the amount of $36,676,279 million—the amount Allnex owes Cytec under the Agreement with respect to the Disputed Claims, as discussed in ¶ 45, *supra*—or an amount to be determined at trial.

---

[7]  If necessary, Cytec also seeks a declaration that the cessation of selling bank drafts, referred to *supra* ¶¶ 77-79, was permitted under the Agreement.

## COUNT FOUR: BREACH OF CONTRACT

91.   Cytec  hereby repeats and realleges the allegations set forth in Paragraphs 1-90 of this Complaint as if fully set forth herein.

92.   In breach of the implied covenant of good faith and fair dealing in the Agreement, Allnex acted in bad faith, by preparing the Closing Date Net Working Capital Statement and Final Closing Date Net Working Capital Statement in such a way as to artificially minimize the amount of net working capital and Cash in the Business (and thereby deprive Cytec of the benefits to which it is entitled under the Agreement).

93.   As a result, Cytec has been damaged in at least the amount of the purchase price that Allnex should have, but has not, paid Cytec, namely, $36,676,279 or an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Cytec prays for judgment against Allnex:

a.  Declaring that (i) the Disputed Claims are outside the scope of the Referral Clause and (ii) the Disputed Claims do not provide a basis to reduce the purchase price of the Business.

b.  To the extent necessary, declaring that (i) the $193,230 Shanghai Bank Draft Claim is outside the scope of the Referral Clause, and (ii) the Shanghai Bank Draft Claim issue does not provide a basis to reduce the purchase price of the Business.

c.  Awarding Cytec $36,676,279 (in connection with the Disputed Claims), and, to the extent necessary, awarding Cytec $193,230 (in connection with the Shanghai Bank Draft Claim).

d.  Awarding Cytec damages of $36,676,279, or an amount to be determined at trial, for breach of contract.

e.  Awarding Cytec prejudgment interest, its costs in this action, and reasonable attorneys' fees.

f.  Granting such other and further relief as this Court deems just and proper.

DATED:   New York, New York
March 7, 2014

Respectfully submitted,

By:  _Joseph E. Neuhaus_
Joseph E. Neuhaus
Thomas C. White
Lauren R. Mendolera
Joshua S. Levy

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Telephone:  (212) 558-4000
Facsimile:  (212) 558-9105
E-mail:  neuhausj@sullcrom.com
*Attorneys for Plaintiff Cytec Industries Inc.*