UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CYTEC INDUSTRIES INC.,

                Plaintiff,                14-cv-1561 (PKC)

    -against-                   MEMORANDUM
                                                             AND ORDER

ALLNEX (LUXEMBOURG) & CY S.C.A.,

                Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        This is a dispute between buyer and seller of a business over contractual liabilities for environmental remediation costs at a site in Kalamazoo, Michigan. The parent company of Allnex (Luxembourg) & Cy S.C.A. ("Allnex") entered into a Stock and Asset Purchase Agreement (the "Agreement") for the purchase of the coating resins business owned by Cytec Industries Inc. ("Cytec"). Almost immediately, a disagreement arose as to whether Cytec or Allnex was the party responsible for environmental remediation of the Kalamazoo chemical production facility. Sulfuric acid and liquid alum had historically been manufactured at that site, and while those chemicals were not used to make coating resins, both parties knew that contamination liabilities were associated with the Kalamazoo facility.

        As part of the Agreement, Allnex agreed to "assume . . . discharge or perform when due all the Assumed Liabilities" set forth by the Agreement. "Assumed Liabilities" is a defined term. It includes "all Liabilities" of Cytec, "to the extent related to, or used or held in connection with" the coating resins business, and specifically "all such Liabilities to the extent relating to Environmental Laws with respect to any facilities located in the United States . . . ." Cytec seeks declaratory judgment that Allnex is responsible for all remediation costs at the

Kalamazoo site. Allnex contends that the Agreement's definition limits environmental liabilities to contamination directly caused by the manufacture of coating resins.

Discovery in this case is closed and both sides move for summary judgment. Their dispute turns principally on the interpretation of unambiguous contractual language. For reasons that will be explained, the Court concludes that the Agreement unambiguously provides that Allnex assumed all liabilities for remediation of the Kalamazoo site. Cytec's motion for summary judgment is therefore granted, and Allnex's motion is denied.

BACKGROUND.

   A.  <u>Cytec's Sale of Its Coating Resins Business.</u>

Cytec was formed in 1993, when it was spun off from American Cyanamid Company ("ACY"). (Pl. 56.1 ¶ 1; Def. 56.1 Resp. ¶ 1.) When Cytec was formed, it acquired various chemical manufacturing facilities, including the one located in Kalamazoo, Michigan. (Pl. 56.1 ¶ 2; Def. 56.1 Resp. ¶ 2.) Cytec assumed all environmental liabilities for those sites. (Pl. 56.1 ¶ 3; Def. 56.1 Resp. ¶ 3.)

In January 2012, Cytec began to market the sale of its coating resins business (the "Business"). (Def. 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7.) In prior public statements, Cytec had mentioned "weakening demand" for coating resins products and the possibility of selling the Business. (Pl. 56.1 ¶ 20; Def. 56.1 Resp. ¶ 20.) The Business was not a separate, standalone entity within Cytec, but a financial-reporting segment that included various coating resins products. (Def. 56.1 ¶¶ 8, 15; Pl. 56.1 Resp. ¶¶ 8, 15.) During the sales process, the Business was often referred to by the name "Monarch." (Def. 56.1 ¶ 9; Pl. 56.1 Resp. ¶ 9.)

In preparation for the sale of the Business, Cytec created <u>pro forma</u> financial statements that were audited by KPMG. (Def. 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10; Pl. 56.1 ¶¶ 25-26;

Def. 56.1 Resp. ¶¶ 25-26.) Because the coating resins business was not a standalone company, Cytec chose which subsidiaries, assets and liabilities would be part of the sale. (Pl. 56.1 ¶ 27; Def. 56.1 Resp. ¶ 27.) The pro forma financial statements detailed the Business's environmental liabilities, among other things. (Def. 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.)

The pro forma financial statements stated that "[o]ur most significant environmental liabilities relate to remediation and regulatory closure obligations at manufacturing sites now or formerly owned by us." (Pl. 56.1 ¶ 29; Def. 56.1 Resp. ¶ 29.) The statements included an "aggregate environmental related accrual" of liabilities of $32.9 million as of December 31, 2011, and $35.1 million as of June 30, 2012. (Pl. 56.1 ¶ 30; Def. 56.1 Resp. ¶ 30.) A Form 10-Q filing of August 2012 and a due diligence report authored by Ernst & Young listed the same figures. (Pl. 56.1 ¶¶ 31, 40; Def. 56.1 Resp. ¶¶ 31, 40.) Those figures included $3.1 million "in accrued expenses with the remainder included in other noncurrent liabilities." (Def. 56.1 ¶ 13; Pl. 56.1 Resp. ¶ 13; see also Pl. 56.1 ¶ 40; Def. 56.1 Resp. ¶ 40 (Ernst & Young report listed $3.1 million in current liabilities and $32 million in non-current liabilities).)

Cytec commissioned environmental assessments of its properties, including "Phase I" assessments of known environmental concerns and "Phase II" assessments of potential environmental concerns. (Pl. 56.1 ¶¶ 32-35; Def. 56.1 Resp. ¶ 32-35.) Regarding the Kalamazoo facility, the Ernst & Young due diligence report stated that "Cytec will transfer the overall site including the land and buildings to Monarch with the exception of" certain assets "for KM Polymer facility only." (Pl. 56.1 ¶ 38; Def. 56.1 Resp. ¶ 38.) The Ernst & Young report also stated: "Monarch maintains liabilities to address environmental related exposures. Such liabilities are maintained at the site level . . . . Certain of the Monarch sites have a long

history of chemical operations, which has resulted in some cases in legacy groundwater and soil contamination." (Pl. 56.1 ¶ 39; Def. 56.1 Resp. ¶ 39.) The same report identified reserves of $0.9 million for the Kalamazoo facility. (Pl. 56.1 ¶ 41; Def. 56.1 Resp. ¶ 41.)

B. Advent's Successful Bid to Acquire the Business.

Advent International Corporation ("Advent") is a private equity firm with a controlling interest in defendant Allnex. (Def. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4.) Advent began to consider acquiring the Business in early 2012, and eventually submitted a total of three bids. (Def. 56.1 ¶¶ 16-17; Pl. 56.1 Resp. ¶¶ 16-17.) During the negotiation and due diligence process, Advent retained the services of outside counsel and an environmental consulting firm, among other advisors. (Pl. 56.1 ¶¶ 52, 58; Def. 56.1 Resp. ¶¶ 52, 58.) The eventual Agreement was negotiated at arm's length between sophisticated parties.

As part of the bidding process, Advent reviewed a Confidential Information Memorandum prepared by Cytec, a draft Stock and Asset Purchase Agreement prepared by Cytec and performed due diligence through a Virtual Data Room, which included Phase II environmental assessments of the Business's sites. (Pl. 56.1 ¶¶ 43-48, 56-57; Def. 56.1 Resp. ¶¶ 43-48, 56-57.) Advent and other bidders submitted questions to Cytec during the due diligence phase. (Pl. 56.1 ¶¶ 74-77; Def. 56.1 Resp. ¶¶ 74-77.)

Advent retained Environ Germany GmbH ("Environ") to analyze the Business's environmental liabilities. (Pl. 56.1 ¶¶ 58, 78; Def. 56.1 Resp. ¶¶ 58, 78.) For the Kalamazoo facility, Environ reviewed Phase I and Phase II reports, and a May 2012 summary of the site's "waste management units." (Pl. 56.1 ¶ 66; Def. 56.1 Resp. ¶ 66.) The Phase I report noted that the Kalamazoo facility had "[t]wo historic sulfuric acid spill areas," and that based on the site's "long industrial history" of using and storing other hazardous chemicals, "the potential for

impacts from discontinued operations cannot be ruled out." (Pl. 56.1 ¶¶ 67-68; Def. 56.1 Resp. ¶¶ 67-68.) Environ concluded that the Kalamazoo facility's possible liabilities included "[a] historic sulfuric acid spill," "waste generated by the former liquid alum manufacturing process," and pellets of vanadium pentoxide left by the former sulfuric acid plant. (Pl. 56.1 ¶ 72; Def. 56.1 Resp. ¶ 72.) Environ separately conducted an independent review and assessment of the Business's environmental reserves, known liabilities and potential liabilities, including known environmental liabilities at the Kalamazoo facility. (Pl. 56.1 ¶ 78-81; Def. 56.1 Resp. ¶ 78-81.)

As noted, Advent submitted a total of three bids for the acquisition of the Business. Its final offer was for a $1.175 billion all-cash acquisition of the Business. (Pl. 56.1 ¶ 89; Def. 56.1 Resp. ¶ 89.) The final offer listed "environmental liabilities" of $35.1 million. (Pl. 56.1 ¶ 91; Def. 56.1 Resp. ¶ 91.)

The final Agreement was negotiated at arm's length with the advice of outside counsel. During the bidding process, Advent and its outside counsel proposed revisions to the Agreement. (Pl. 56.1 ¶ 93; Def. 56.1 Resp. ¶ 93.) These proposed revisions included alterations to the Agreement's definition of "Assumed Liabilities." (Pl. 56.1 ¶ 94; Def. 56.1 Resp. ¶ 94.) Cytec's outside counsel reviewed Advent's proposed changes and rejected many of them. (Pl. 56.1 ¶ 95; Def. 56.1 Resp. ¶ 95.) Negotiations also took place in face-to-face meetings that included the outside counsel for both Advent and Cytec. (Pl. 56.1 ¶¶ 110, 113; Def. 56.1 Resp. ¶¶ 110, 113.)

On October 8, 2012, Cytec's board of directors approved the transaction as set forth in the Agreement. (Pl. 56.1 ¶ 122; Def. 56.1 Resp. ¶ 122.) Cytec, and the Advent entity that acquired the Business, "AcquiCo," executed the Agreement that same day. (Pl. 56.1 ¶ 123; Def. 56.1 Resp. ¶ 123.) AcquiCo was later renamed Allnex (Luxembourg) and Cy S.C.A. (Pl.

56.1 ¶ 124; Def. 56.1 Resp. ¶ 124.)  The transaction closed on April 3, 2013.  (Def. 56.1 ¶ 28; Pl. 56.1 Resp. ¶ 28.)

    C.  <u>The Parties' Disagreements Concerning the Kalamazoo Site.</u>

Shortly after the parties signed the Agreement, they began to dispute which of them was responsible for expenses related to environmental remediation of the Kalamazoo facility.

The Kalamazoo site had a manufacturing history that long predated its acquisition by Cytec and its later sale to Allnex.  From 1946 to 1975, Cytec's predecessor, ACY, manufactured sulfuric acid in Kalamazoo, during which time the site had two "spill areas" of sulfuric acid.  (Pl. 56.1 ¶¶ 4, 67; Def. 56.1 Resp. ¶¶ 4, 67.)  A substance called liquid alum also was manufactured at the facility, until its production was discontinued in 1985.  (Pl. 56.1 ¶¶ 4-6; Def. 56.1 Resp. ¶¶ 4-6.)

In 1998, the Michigan Department of Environmental Quality ("MDEQ") issued Cytec a Hazardous Waste Container Storage Operating License for the Kalamazoo facility.  (Pl. 56.1 ¶ 7; Def. 56.1 Resp. ¶ 7.)  Pursuant to the Operating License, Cytec began to remediate historical contaminations at the Kalamazoo facility, specifically those caused by the manufacture of sulfuric acid and liquid alum.  (Pl. 56.1 ¶¶ 8-10; Def. 56.1 Resp. ¶¶ 8-10.)

Cytec began to manufacture KMP Polymers at the Kalamazoo facility in or about 2006.  (Pl. 56.1 ¶ 11; Def. 56.1 Resp. ¶ 11.)  It has continued to do so since the transaction closed, as part of an arrangement that Cytec describes as unusual relative to other sites acquired by Allnex.  (Def. 56.1 ¶ 37; Pl. 56.1 Resp. ¶ 37; Pl. Mem. at 24.)  Schedule 2.20(a) of the Agreement contains descriptions of real property for each of the transferred sites, and partially describes the Kalamazoo property as follows: "Current Operating Plant Site located in

Kalamazoo, MI. This is currently a shared site. The site will be owned by Monarch and Cytec will have a ground lease to the property where the [KMP Polymers] unit is currently located and the surrounding area." (Agrmt. Disclosure Sched. at 508.) It does not appear that any of the disputed liabilities relate to the manufacture of KMP Polymers.

In a letter to Cytec dated August 23, 2010, the MDEQ proposed a consent order "to address the corrective action requirements" of the Kalamazoo facility. (Pl. 56.1 ¶ 144; Def. 56.1 Resp. ¶ 144.) Cytec and the MDEQ exchanged drafts of the consent order between 2010 and 2011, and Cytec entered into a consent order on March 6, 2013 (the "Consent Order"), about a month before the transaction closed. (Pl. 56.1 ¶¶ 145-46; Def. 56.1 Resp. ¶ 145-46.) The Consent Order applies to 14 waste management units ("WMUs") and one area of concern ("AOC"). (Pl. 56.1 ¶ 147; Def. 56.1 Resp. ¶ 147.) Under the Consent Order, Cytec agreed to take corrective actions as to six WMUs that arose out of the production of sulfuric acid. (Pl. 56.1 ¶ 148; Def. 56.1 Resp. ¶ 148.) All of the WMUs requiring corrective actions under the Consent Order were identified in the Virtual Data Room provided by Cytec during the due diligence process. (Pl. 56.1 ¶ 149; Def. 56.1 ¶ 149.)

On April 26, 2013, Allnex's outside environmental counsel wrote to Cytec's chief litigation counsel with a proposed allocation of responsibility for the WMUs at the Kalamazoo facility based on "the source of contamination and/or the uses of the areas/facilities that comprise the WMUs (coating or non-coating)." (Pl. 56.1 ¶ 152; Def. 56.1 Resp. ¶ 152.) The letter proposed that Allnex would pay remediation expenses that arose from the coating resins business, and that Cytec would pay expenses that related to the historical manufacture of sulfuric acid and liquid alum. (Pl. 56.1 ¶ 152; Def. 56.1 Resp. ¶ 152.)

Cytec's counsel rejected the proposed allocation "as well as any suggestion" that Allnex "did not assume all environmental liabilities at the Kalamazoo facility under the [Agreement]." (Pl. 56.1 ¶ 153; Def. 56.1 Resp. ¶ 153.) In a letter of March 26, 2014, Allnex's outside environmental counsel stated that pursuant to the Agreement, Allnex "is only responsible for" WMUs "if, and only to the extent, contamination associated with such WMUs resulted from the 'Business' (as that term is defined in the [Agreement]) as conducted by Cytec. Those WMU's that were not the result of operation of the Business are Excluded Liabilities." (Pl. 56.1 ¶ 154; Def. 56.1 Resp. ¶ 154.)

Cytec commenced this action on March 7, 2014. (Docket # 2.) Subject matter jurisdiction is premised on diversity of citizenship. Of the four claims originally asserted, only Cytec's claim concerning the environmental liabilities remains unresolved.

SUMMARY JUDGMENT STANDARD.

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. A fact is material if it "might affect the outcome of the suit under the governing law . . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). On a motion for summary judgment, the court must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." Delaney v. Bank of Am. Corp., 766 F.3d 163, 167 (2d Cir. 2014) (quotation marks omitted). It is the initial burden of the movant to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief, and the evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).

If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson, 477 U.S. at 248).

DECLARATORY JUDGMENT STANDARD.

Cytec seeks summary judgment for its claim of declaratory judgment pursuant to 28 U.S.C. § 2201. Cytec seeks a declaration "that Allnex is required to pay for all environmental liabilities associated with contamination at the Kalamazoo, Michigan site at Closing as Assumed Liabilities under the Agreement." (Second Am. Compl't ¶ 40.)

The Declaratory Judgment Act states in part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C.A. § 2201(a). "The Declaratory Judgment Act confers on federal courts 'unique and substantial discretion in deciding whether to declare the rights of litigants.'" Peconic Baykeeper, Inc. v. Suffolk County, 600 F.3d 180, 187 (2d Cir. 2010) (quoting Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995). "In order to decide whether to entertain an action for declaratory judgment, we have instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 389 (2d Cir. 2005).

The Court concludes that declaratory judgment would serve the useful purpose of clarifying or settling the legal issues involving the liability for remediation of the historical contamination of the Kalamazoo facility. Declaratory judgment would also finalize the parties' controversy and offer relief from uncertainty as to the same issue.

DISCUSSION.

I. New York Law Governs the Agreement.

The Agreement provides, in all-capitalized letters, that it "shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of law." (Agrm't § 8.8(a).) The Court therefore construes the Agreement pursuant to New York law.

II. Because the Contract Is Unambiguous, the Court Does Not Consider Parol Evidence.

Both sides have asserted that the relevant provisions of the Agreement are unambiguous, and that the Court can interpret the Agreement without considering parol evidence. At the same time, Cytec and Allnex have each raised a battery of arguments about the positions taken during the Agreement's negotiation, and their internal understandings of which party is responsible for the historical environmental liabilities of the Kalamazoo facility.

"Where the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole." Ellington v. EMI Music, Inc., 24 N.Y.3d 239, 244 (2014); accord Beal Sav. Bank v. Sommer, 8 N.Y.3d 318, 324 (2007) ("Construction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its

terms."); Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002) ("The best evidence of what parties to a written agreement intend is what they say in their writing.").

A court may consider extrinsic evidence of the parties' intent only if it concludes that the contract is ambiguous. Greenfield, 98 N.Y.2d at 569. "'[A] contract is not rendered ambiguous just because one of the parties attaches a different, subjective meaning to one of its terms.'" Bank of New York Mellon v. WMC Mortgage, LLC, 136 A.D.3d 1, 9 (1st Dep't 2015) (quoting Bajraktari Mgt. Corp. v. American Int'l Grp., Inc., 81 A.D.3d 432, 432 (1st Dep't 2011)); accord Johnson v. Lebanese Am. Univ., 84 A.D.3d 427, 435 (1st Dep't 2011) ("[T]hat one party to an agreement may attach a particular, subjective meaning to a term that differs from the term's plain meaning does not render the agreement ambiguous.").

A contract is unambiguous if its language has "a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." Greenfield, 98 N.Y.2d at 569-70, (quotation marks and alteration omitted). "It is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face." W.W.W. Associates, Inc. v. Giancontieri, 77 N.Y.2d 157, 163 (1990) (quotation marks omitted). Courts should especially refrain from adding additional terms when sophisticated parties enter into a contract negotiated at arm's length by knowledgeable counsel. See, e.g., Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc., 117 A.D.3d 450, 450-51 (1st Dep't 2014).

In this case, extrinsic and parol evidence are also precluded by the Agreement's broad merger clause. "[T]he purpose of a merger clause is to give full effect to the parol evidence rule, which bars extrinsic evidence tending to vary the terms of the agreement in which

the merger clause is included." Garthon Bus. Inc. v. Stein, 138 A.D.3d 587, 591 (1st Dep't 2016); accord Indigo Secured High Income Note, Ltd. v. HCI Secured Med. Receivables Special Purpose Corp., 140 A.D.3d 589, 590 (1st Dep't 2016) ("[T]he [agreement] is the best evidence of the parties' understanding and should be enforced according to its terms, especially in view of [its] valid merger clause.") (internal citation omitted). "Under the traditional rules of contract law, the courts will enforce a clear and unambiguous merger clause . . . ." Friedman v. Ocean Dreams, LLC, 56 A.D.3d 719, 720 (2d Dep't 2008). "Merger clauses are not mere boilerplate. They provide further protection for the interests of certainty and finality." Torres v. D'Alesso, 80 A.D.3d 46, 53 (1st Dep't 2010) (emphasis in original).

Here, the merger clause provides that the Agreement and related contracts "contain the entire agreement between the parties hereto . . . ." (Agrmt. § 8.4.) It states in full:

> This Agreement (including all Schedules and Exhibits hereto), the Ancillary Agreements, the Restructuring Agreements, the Confidentiality Agreement (to the extent it survives pursuant to Section 4.2) and the Expense Agreement contain the entire agreement between the parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, oral or written, with respect to such matters. In the event of any conflict between this Agreement and any agreement, instrument or other document relating to the Pre-Signing Restructuring Transactions or the Post-Signing Restructuring Transactions, this Agreement shall prevail.

(Agrmt. § 8.4.)

Because the parties agreed to this merger clause, and because the terms of the Agreement are unambiguous, the Court does not consider extrinsic or parol evidence when interpreting the Agreement.

III. <u>Allnex Assumed Liability for the Remediation of All Environmental Liabilities at the Kalamazoo Site.</u>

The parties' dispute turns on the Agreement's definition of the term "Assumed Liabilities."

Section 1.3 of the Agreement provides that "[o]n the terms and subject to the conditions set forth herein, at the Closing, Buyer shall assume from Seller and its Affiliates (other than the Transferred Subsidiaries) and discharge or perform when due all the Assumed Liabilities . . . ." It is undisputed that under this provision, Allnex agreed to "discharge or perform when due all the Assumed Liabilities . . . ."

The Court concludes that remediation of the historical environmental liabilities at the Kalamazoo site falls under the definition of "Assumed Liabilities." The Agreement defines "Assumed Liabilities" as follows:

> "<u>Assumed Liabilities</u>" means (i) <u>all Liabilities of Seller</u> [Cytec] and its Affiliates (other than the Transferred Subsidiaries) <u>to the extent related to, or used or held in connection with, the Business as conducted at any time by Seller and its Affiliates, including, for the avoidance of doubt, all such Liabilities to the extent relating to Environmental Laws with respect to any facilities located in the United States</u> (but excluding, for the avoidance of doubt, all Liabilities to the extent relating to Environmental Laws with respect to facilities located in Belmont, West Virginia, Coventry, Rhode Island and Stamford, Connecticut), the Transferred Seller Intercompany Payables and all Liabilities to the extent included as Liabilities in the calculation of Actual Indebtedness; (ii) all Liabilities of Seller under that certain Side Letter Agreement dated May 11, 2012, by and between the PSA Buyer and Seller; and (iii) all Liabilities related to the Asset Transfer Plans with respect to Transferred Employees.

(Agrmt. at Annex I-5; emphasis added.)

This definition includes other defined terms. The Agreement's definition of "Business" is of particular importance, because Allnex assumed all liabilities of Cytec "to the

- 13 -

extent related to, or used or held in connection with, the Business . . . ." (Agrmt. at Annex I-5.) As defined by the Agreement, "'Business' means the worldwide business of researching, developing, manufacturing, toll manufacturing, marketing and selling liquid coating resins and coating additives, powder coating resins, radiation cure monomers and resins, phenolics and amino cross-linkers and isocyanates (including TMXDI), in each case as conducted by Seller's coating resins financial reporting segment . . . ." (Agrmt. at Annex I-6.)

Although the definition of "Business" is specifically limited to coating resins products, "Assumed Liabilities" is defined as "<u>all Liabilities</u> of Seller . . . to the extent <u>related to, or used or held in connection with</u>, the Business . . . ." (Agrmt. at Annex I-5; emphasis added.) "Liabilities" is broadly defined as "any and all debts, liabilities commitments and obligations of any kind, whether due or to become due, contingent or absolute, matured or unmatured, liquidated or unliquidated, accrued or not accrued, asserted or not asserted, known or unknown, determined, determinable or otherwise, whenever or however arising . . . ." (Agrmt. at Annex I-12.) The phrase "related to, or used or held in connection with" is also broad in scope. Allnex agreed to assume "any and all" liabilities and obligations "of any kind" that "related to," were "used," or "held in connection with" the coating resins business. These liabilities could come in many varieties, and are not narrowly limited to liabilities that occurred exclusively from the manufacture and production of coating resins.

Cytec places particular emphasis on the phrase "held in connection with." It notes that Webster's Third New International Dictionary (2002), at 1078, defines "held" as "to retain in one's keeping; maintain possession of : not give up or relinquish : possess, have . . . ." The Oxford English Dictionary online defines "held" as a past tense of "hold," with the definition of "hold" being "[t]o have or keep as one's own absolutely or temporarily; to own, have as

- 14 -

property; to be the owner, possessor, or tenant of; to be in possession or enjoyment of."[1] These definitions are consistent with common usage of the word "held" and a straightforward reading of its use in the Agreement. In agreeing to assume "any and all" liabilities that were "held in connection with" the coating resins business, Allnex agreed to "discharge or perform when due" (Agrmt. § 1.3) those liabilities. It did so without qualification, and liabilities "held" by the "Business" for the remediation of historical environmental contamination fall comfortably within the definition of "Assumed Liabilities."

The terms "related to" and "used" are similarly broad. In agreeing to assume "any and all" liabilities "related to" the coating resins business, Allnex did not confine itself to liabilities directly resulting from the manufacture and production of coating resins. The historical liabilities at the Kalamazoo site "related to" the "Business" because they historically existed at one of the Business's coating resins production sites, which Allnex acquired. That same facility was "used" by the "Business." The parties could have contracted for a narrower definition of "Assumed Liabilities," one that encompassed only those liabilities directly attributable to the manufacture of coating resins. They did not do so.

Allnex argues that the immediately-following language provides for a more limited transfer of liability. The definition proceeds to state that Allnex would assume liabilities "including, for the avoidance of doubt, all such Liabilities to the extent relating to Environmental Laws with respect to any facilities located in the United States . . . ." (Agrmt. at Annex I-5.) According to Allnex, the word "such" narrowly limits liabilities to those arising from the "Business." (Id. at 24.) As articulated by Allnex: "'[S]uch Liabilities' means liabilities of the kind mentioned in the preceding clause – those liabilities 'to the extent related to, or used or held

---

[1] See http://www.oed.com/view/Entry/87689?rskey=Z3oSLH&result=7&isAdvanced=false#eid

in connection with, the Business.'" (Id.) Allnex observes that the word "such" often performs a limiting function. See, e.g., Kolbe v. Tibbetts, 22 N.Y.3d 344, 353 (2013) ("The phrase 'at such time as the employee retires' is most logically read to qualify the immediately preceding phrase . . . .").

Allnex's argument is based on a convoluted reading of the Agreement's unambiguous language. The parties agreed that the Assumed Liabilities would "includ[e], for the avoidance of doubt, all such Liabilities to the extent relating to Environmental Laws with respect to any facilities located in the United States . . . ." As noted, "all such Liabilities" would include "any and all debts, liabilities, commitments and obligations of any kind" (Agrmt. at Annex I-12) that were related to, used or held by the coating resins business. The "Assumed Liabilities" definition specifically provides that these "Liabilities" include those "relating to Environmental Laws" with respect to United States facilities. (Agrmt. at Annex I-5.) The Agreement defines "Environmental Law" as "any Law, Governmental Authorization, Order or legally binding policy or guideline relating to (i) the protection of the environment (including soil . . . land surface or subsurface strata . . .)" or "(ii) the use, storage, . . . release or disposal of, any Hazardous Substance . . . ." (Agrmt. at Annex I-8-9.)

Rather than limiting "Liabilities" to contaminations directly traceable to coating resins production, the language relied on by Allnex specifically encompasses liability under the "Environmental Laws." Therefore, incorporating the defined terms, the definition of "Assumed Liabilities" specifies, "for the avoidance of doubt," that Assumed Liabilities include "any and all . . . liabilities . . . and obligations of any kind" specifically "relating to" "any Law" or "Order" "relating to . . . the protection of the environment," or "the use, storage . . . release or disposal of,

any Hazardous Substance . . . ."[2] (Agrmt. at Annex I-5, I-8-9, I-12.) The language cannot be construed as limiting "Assumed Liabilities" only to liabilities that directly arose from the production of coating resins. It comfortably includes historical liabilities, such as those subject to remediation in Kalamazoo.

This construction of the Agreement is further supported by the location-specific carve-out for facilities in Belmont, West Virginia, Coventry, Rhode Island and Stamford, Connecticut. (Agrmt. at Annex I-5.) The definition provides for the transfer of liabilities "including, for the avoidance of doubt, all such Liabilities to the extent relating to Environmental Laws with respect to any facilities located in the United States (but excluding, for the avoidance of doubt, all Liabilities to the extent relating to Environmental Laws with respect to facilities located in Belmont, West Virginia, Coventry, Rhode Island and Stamford, Connecticut) . . . ." (Agrmt. at Annex I-5.) The use of the word "such" does not perform a limiting function, but rather, "for the avoidance of doubts," expressly transfers the Business's environmental liabilities generally, with location-specific exceptions for the Belmont, Coventry and Stamford sites. Environmental liabilities for these three sites are separately identified in the Agreement's definition of "Excluded Liabilities," but historical environmental liabilities are not. (Agrmt. at Annex I-9.)

This construction of "Assumed Liabilities" is also consistent with section 2.7 of the Agreement, which states that the financial statements "fairly represent: in all material respects . . . the Assumed Liabilities . . . ." (Agrmt. § 2.7.) As set forth in the financial

---

[2] The term "Hazardous Substance" "means any substance that is listed, defined, designated or classified as hazardous, toxic or otherwise harmful under any Environmental Law, including petroleum products and byproducts, asbestos-containing material and polychlorinated biphenyls." (Agrmt. at Annex I-11.) The parties have not discussed this definition, but, again, this is a broad definition, one covering "any substance" deemed harmful "under any Environmental Law.

statements, the Business's "most significant environmental liabilities relate to remediation and regulatory closure obligations at manufacturing sites now or formerly owned by us. . . . As of June 30, 2012 and December 31, 2011, the aggregate environmental related accruals were $35.1 and $32.9, respectively, of which $3.1 is included in accrual expenses with the remainder included in other noncurrent liabilities." (Harkness Dec. Ex. 3 at 14.) In agreeing that the financial statements "fairly represent[ed]" the Assumed Liabilities "in all material respects," Allnex and Cytec did not differentiate the aggregate environmental accruals from some smaller subset thereof.

Lastly, Allnex argues that this Court concluded at the motion to dismiss stage that Allnex is responsible only for those liabilities directly attributable to the coating resins business. See Cytec Indus., Inc. v. Allnex (Luxembourg) & Cy S.C.A., 2015 WL 3762592, at *13-14 (S.D.N.Y. May 15, 2015). But the Court's decision denying Allnex's motion to dismiss did not purport to interpret the definition of "Assumed Liabilities," and merely concluded that Cytec had plausibly alleged that some portion of the disputed liabilities were attributable to the Business. See id. at * 14 ("It appears that Allnex is correct that the Agreement limits its responsibility to liabilities 'related to, or used or held in connection with, the Business . . . .' (Agrmt. Annex I–5.) However, the Court is unable to determine, at the Rule 12(b)(6) stage, which portions of the disputed liabilities at the Kalamazoo site are so related."). Allnex's assertion that this Court had previously decided this issue in its favor is meritless.

CONCLUSION.

Cytec's motion for summary judgment is GRANTED and Allnex's motion for summary judgment is DENIED. The Clerk is directed to terminate those motions. (Docket # 98,

102.)  The Clerk is directed to terminate the parties' motions in limine as moot.  (Docket # 95, 106, 109.)

Within fourteen days, Cytec shall submit to the Court a proposed judgment on notice.

SO ORDERED.

*P. Kevin Castel*
P. Kevin Castel
United States District Judge

Dated: New York, New York
       June 19, 2017